PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VOLVO CONSTRUCTION EQUIPMENT
NORTH AMERICA, INC., a Delaware
corporation; VOLVO TRADEMARK
HOLDING AKTIEBOLAGET, a Swedish
corporation; CHAMPION ROAD
MACHINERY LIMITED, a Canadian
corporation,
               *Plaintiffs-Appellees,*

v.

CLM EQUIPMENT COMPANY, INC., a
Louisiana corporation; FUTURE
EQUIPMENT COMPANY, INC., a Texas
corporation, CLARK MACHINERY
COMPANY, an Arkansas corporation,
               *Defendants-Appellants,*

and

AIS CONSTRUCTION EQUIPMENT
CORPORATION, a Michigan
corporation; NUECES FARM CENTER,
INC., d/b/a Nueces Power
Equipment, a Delaware corporation,
               *Defendants.*

No. 03-1108

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-00-238-1; CA-01-232-1)

Argued: September 24, 2003

Decided: October 8, 2004

Before WIDENER, TRAXLER, and KING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Traxler joined. Judge Widener wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Scott E. Korzenowski, DADY & GARNER, P.A., Minneapolis, Minnesota, for Appellants. Michael J. Lockerby, HUNTON & WILLIAMS, Richmond, Virginia, for Appellees. **ON BRIEF:** J. Michael Dady, Ronald K. Gardner, DADY & GARNER, P.A., Minneapolis, Minnesota; Robert B. Delano, Jr., SANDS, ANDERSON, MARKS & MILLER, Richmond, Virginia; Edward L. Bleynat, Jr., FERIKES & BLEYNAT, P.L.L.C., Asheville, North Carolina, for Appellants. Kimberley A. Isbell, HUNTON & WILLIAMS, Richmond, Virginia; Nash E. Long, III, HUNTON & WILLIAMS, Charlotte, North Carolina, for Appellees.

## OPINION

KING, Circuit Judge:

Three retail dealers of large earth-moving motor graders (the "Dealers")[1] appeal the district court's decision in favor of the graders' manufacturers (collectively, "Volvo")[2] in this contract dispute. *Volvo Trademark Holding Aktiebolaget v. CLM Equip. Co., Inc.*, 236 F.

---

[1]The Dealers are CLM Equipment Company, Inc., a Louisiana corporation, Clark Machinery Company, an Arkansas corporation, and Future Equipment Company, Inc., a Texas corporation.

[2]The three appellees, referred to as Volvo, are Volvo Construction Equipment North America, Inc., a Delaware corporation, Volvo Trademark Holding Aktiebolaget, a Swedish corporation, and Champion Road Machinery Limited, a Canadian corporation.

Supp. 2d 536 (W.D.N.C. 2002) (the "Opinion"). The Dealers maintain that the court lacked jurisdiction in the declaratory judgment proceeding initiated by Volvo because no actual controversy existed. The Dealers also assert that, even if the court possessed jurisdiction, it abused its discretion by exercising jurisdiction in that proceeding. Finally, the Dealers contend that the court erroneously ruled in favor of Volvo on the merits of this dispute, in that Volvo's refusal to supply them with equipment constituted a breach of its contractual obligations and contravened several state statutes. For the reasons explained below, we affirm in part, vacate in part, and remand.

I.

A.

Prior to being purchased by Volvo in 1997, Champion Road Machinery Limited ("Champion") was a Canadian corporation specializing in the manufacture of large earth-moving motor graders (the "Champion Motor Graders").[3] The contract dispute underlying this litigation emanates from Volvo's 1997 purchase of Champion and Volvo's subsequent decision to cease supplying Champion Motor Graders to the Dealers — CLM Equipment Company, Inc. ("CLM"), Clark Machinery Company ("Clark"), and Future Equipment Company, Inc. ("FEC") — for resale. That decision resulted in what the Dealers contend was Volvo's unlawful termination of their dealer agreements with Champion (the "Dealer Agreements").[4] According to the Dealers, Champion promised them, during a 1970s effort to increase its dealerships in this country, that it would "continue a business relationship with a dealer unless the dealer was having financial difficulties or was performing poorly." The Dealers allege that Cham-

---

[3]Because we are reviewing an award of judgment on the pleadings, our factual recitation is presented in the light most favorable to the nonmoving party (i.e., the Dealers). *George C. Frey Ready-Mixed Concrete, Inc. v. Pall Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir. 1977); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1368 (2d ed. 1990).

[4]The three Dealer Agreements at issue are entitled "Distributor Sales Agreement[s]" (CLM and Clark) and "Grader Dealer Agreement" (FEC). We refer to each as a Dealer Agreement.

pion promised to terminate a Champion dealer "only after first giving the dealer notice of its deficiencies and an opportunity to correct those deficiencies." The Dealers maintain that Champion representatives also made contemporaneous oral representations that the Dealers could continue as Champion dealers so long as they adequately performed. This contract dispute relates primarily to the interpretation and application of a specific subsection of the Termination section of the Dealer Agreements. That subsection, the "Without Cause Provision," authorizes termination of a dealership without cause, providing as follows:

> Champion may terminate this agreement at any time without cause by written notice of termination delivered to [Dealer or Distributor], such termination to be effective not less than sixty (60) days after receipt or deemed receipt by Dealer of such notice.

CLM, Clark, and FEC Dealer Agreements § 24.4. Although the Without Cause Provision is important in this appeal, several other provisions of the Dealer Agreements are also significant. They include:

- a merger and integration clause (the "Integration Clause"), providing that a Dealer Agreement contains the entire agreement respecting a Dealer's purchase and distribution of Champion products and parts; CLM and Clark Dealer Agreements § 32.1, FEC Dealer Agreement § 33.1;

- a clause prohibiting oral modification (the "Modification Clause"), providing that any modification of a Dealer Agreement must be in writing and signed by a duly authorized officer of Champion; CLM and Clark Dealer Agreements § 32.2, FEC Dealer Agreement § 33.2;

- a market withdrawal provision (the "Market Withdrawal Provision"), pursuant to which Champion reserves the right to discontinue its product lines without notice to the Dealers; CLM, Clark, and FEC Dealer Agreements § 27;

- a best efforts provision (the "Best Efforts Provision"), under which the Dealers agree to use their best efforts to sell Champion products; CLM and Clark Dealer Agreements § 6, FEC Dealer Agreement § 7;

- a choice-of-law provision (the "Choice-of-Law Provision"), providing that, pursuant to CLM's and Clark's Dealer Agreements, the obligations of the parties are to be determined under South Carolina law; CLM and Clark Dealer Agreements § 29; and that, pursuant to FEC's Dealer Agreement, the obligations of the parties are to be governed by the law of Ontario; FEC Dealer Agreement § 29; and

- a conformity with local laws provision (the "Local Law Provision"), under which the rights and obligations of the parties are subject to all applicable laws of government entities having jurisdiction over them, and providing that, if local law substantially alters relationships under a Dealer Agreement, a party may request modification of the Agreement; CLM, Clark, and FEC Dealer Agreements § 30.

After consummating its purchase of Champion, Volvo decided that it could compete more effectively with such manufacturers as Case, Caterpillar, John Deere, and Komatsu if it marketed motor graders under a single brand name (i.e., Volvo) and through a single dealer network (i.e., that of Volvo).[5] As a result, Volvo implemented a plan to "Volvoize" its products and "rationalize" its dealer network. Volvo characterized the "Volvoization" program as a process of reengineering and rebranding Champion Motor Graders for sale under the VOLVO trademark. Volvo characterized its "Dealer Rationalization" plan as the integration of the Volvo and Champion dealer networks.

In 2000, the Dealers responded to Volvo's plan by demanding that Volvo continue to provide them with motor graders manufactured by

---

[5]According to Volvo, its competing manufacturers typically market a full line of construction equipment, and their dealers offer "one-stop shopping" for such products.

Volvo at the former Champion factory. Despite these demands, the Dealers were not selected by Volvo as authorized dealers of such motor graders, and Volvo notified the Dealers that it would no longer supply them with Champion Motor Graders. On January 19, 2000, FEC received notice that its Dealer Agreement would be terminated on March 19, 2000. On October 10, 2000, Volvo notified Clark and CLM that their Dealer Agreements would be terminated on January 9, 2001. Upon receipt of these termination notices, the Dealers advised Volvo that they would litigate all efforts to terminate the Dealer Agreements. In January 2001, after receipt of such advice from the Dealers, Volvo ceased manufacturing Champion brand motor graders.

B.

On October 10, 2000, Volvo filed its declaratory judgment complaint in the Western District of North Carolina (the "North Carolina Litigation"), naming as defendants CLM, FEC, AIS Construction Equipment Corporation ("AIS"), and certain other Champion dealers, including Nueces Farm Center, Inc. ("NFC"). By this civil action, Volvo sought a declaration that, pursuant to the Dealer Agreements, it was not obliged to continue supplying Champion Motor Graders to Champion dealers. On November 27, 2000, the defendants sought dismissal of the North Carolina Litigation for lack of subject-matter jurisdiction. In response, Volvo amended its declaratory judgment complaint and, *inter alia*, named Clark as an additional defendant. On March 19, 2001, before the district court addressed the jurisdictional issue, Volvo sought leave to amend its complaint for a second time, dropping defendant NFC from the North Carolina Litigation and asserting diversity jurisdiction in the North Carolina court.[6]

On March 20, 2001, the Dealers filed a separate civil action against Volvo in the Eastern District of Arkansas (the "Arkansas Litigation"). The Dealers then moved the North Carolina court to dismiss, abstain from, or stay the North Carolina Litigation, in deference to the Arkan-

---

[6]Both Volvo and NFC are Delaware corporations. NFC, as a defendant, would have destroyed diversity in the North Carolina Litigation. *See* 28 U.S.C. § 1332. With NFC no longer a defendant in the North Carolina Litigation, no diversity issue is raised, and none is apparent.

sas Litigation (the "Dealers' Motion"). On April 9, 2001, a magistrate judge in North Carolina recommended to the district court that the Dealers' Motion be denied and that Volvo be authorized to file its Second Amended Complaint. *Volvo Trademark Holding Aktiebolaget v. AIS Const. Equip. Corp.*, No. 1:00CV238 (W.D.N.C. April 9, 2002).

On April 20, 2001, Volvo moved the Arkansas court to dismiss, abstain from, or stay the Arkansas Litigation, in deference to the North Carolina Litigation. On June 21, 2001, the Arkansas court granted that motion, entering a stay of the Arkansas Litigation pending resolution of the Dealers' Motion in North Carolina. On August 27, 2001, the North Carolina court, relying on the magistrate judge's recommendation, denied the Dealers' Motion, granted Volvo leave to voluntarily dismiss NFC as a defendant, and authorized Volvo to file its Second Amended Complaint (the "Complaint"). *Volvo Trademark*, No. 1:00CV238 (W.D.N.C. Aug. 27, 2001).[7]

Upon being advised of the North Carolina court's ruling on the Dealers' Motion, the Arkansas court, on August 30, 2001, transferred the Arkansas Litigation to the Western District of North Carolina. Thereafter, on September 14, 2001, the Dealers filed their Joint Answer and Counterclaim in the North Carolina Litigation. Their Counterclaim mirrored the claims asserted in their complaint against Volvo in the Arkansas Litigation.[8] On January 9, 2002, the parties

---

[7]Volvo's Second Amended Complaint in the North Carolina Litigation sought the following: (1) a declaration pursuant to the Lanham Act (15 U.S.C. § 1051, *et seq.*) of trademark infringement, unfair competition, and dilution; (2) a declaration that the Lanham Act preempted any state law claims that were inconsistent therewith; (3) a declaration that there had been no breach of contract by Volvo; (4) a declaration that there are no ancillary tort law claims against Volvo; and (5) a declaration that Volvo had not violated any state statutes. Volvo's Second Amended Complaint is the operative complaint in this appeal.

[8]The Dealers asserted twelve claims against Volvo in the Arkansas Litigation and in the North Carolina Litigation. Those claims were for (1) violations of the Arkansas Franchise Practices Act, Ark. Code § 4-72-201, *et seq.*; (2) violations of the Texas Farm, Industrial and Outdoor Power Equipment Dealer Act, Tex. Bus. & Com. Code § 19.01, *et seq.*;

consented to consolidation of the Arkansas Litigation with the North Carolina Litigation in the North Carolina court. *Volvo Trademark*, No. 1:00CV238, No. 1:01CV122 (W.D.N.C. Jan. 9, 2002).

On December 13, 2002, the district court filed the Opinion from which this appeal arises. The Opinion granted Volvo partial judgment on the pleadings, dismissed the Dealers' counterclaims in the North Carolina Litigation, and dismissed the Dealers' affirmative claims in the Arkansas Litigation. Opinion at 558. In its Opinion, the court determined, *inter alia*, that Volvo's refusal to supply the Dealers with Champion Motor Graders did not breach the Dealer Agreements because each agreement contained the Without Cause Provision. *Id.* at 546. In addition, the court concluded that the Dealers were not protected by the state dealer protection statutes of Arkansas, Louisiana, or Texas, because the Choice-of-Law Provision precludes the Dealers from seeking protection under those statutes. *Id.* at 551-54. The Dealers thereafter filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[9]

---

(3) violations of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.*; (4) violations of the Michigan Motor Vehicle Act, Mich. Comp. Laws Ann., Ch. 445.1561, *et seq.*; (5) violations of the Louisiana Dealer Act, La. Rev. Stat. § 51:481, *et seq.*; (6) violations of Ontario's Arthur Wishart Act; (7) violations of the South Carolina Fair Practices of Farm, Construction, Industrial and Outdoor Power Equipment Manufacturers, Distributors, Wholesalers and Dealers Act, S.C. Code Ann. § 39-6-10, *et seq.*; (8) breach of contract and the covenant of good faith and fair dealing; (9) tortious interference with contractual relations and prospective economic advantage; (10) unjust enrichment; (11) estoppel; and (12) recoupment.

[9]We recognize that an award of partial judgment on the pleadings does not generally constitute an appealable order. *See Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 511 (4th Cir. 2003). This appeal is not interlocutory, however, because Volvo has voluntarily dismissed its remaining claims. *Volvo Trademark*, No. 1:00CV238, No. 1:01CV232, No. 1:01CV122 (W.D.N.C. Jan. 2, 2003).

## II.

We review de novo the issue of whether a district court possessed jurisdiction in a declaratory judgment proceeding. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765 (4th Cir. 1991). If a plaintiff has asserted sufficient facts to create declaratory judgment jurisdiction, we review for abuse of discretion a district court's decision to exercise its jurisdiction. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."). We review de novo a district court's award of judgment on the pleadings. Fed. R. Civ. P. 12(c); *see Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002) (noting that same standard is applied to motions under Rule 12(c) and Rule 12(b)(6)). In reviewing an award of judgment on the pleadings, we assume the facts alleged in the relevant pleadings to be true, and we draw all reasonable inferences therefrom. *Elkins Radio*, 278 F.3d at 406; *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Finally, the issue of whether an entity is protected under a state dealer protection statute is a question of law, which we review de novo. *See generally United States v. Hill*, 322 F.3d 301, 304 (4th Cir. 2003); *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 496 (Tex. App. 1994).

## III.

The Dealers raise multiple issues on appeal. They first maintain that the district court erred in exercising jurisdiction in the North Carolina Litigation. Specifically, they contend that Volvo failed to allege an actual controversy between it and the Dealers. Moreover, the Dealers maintain that, even if the court possessed jurisdiction, its exercise thereof constituted an abuse of discretion.

The Dealers next contend that the district court erred when it ruled that Volvo's termination of the Dealer Agreements was not a breach of its contractual obligations. They maintain that the contract terms "may" and "without cause," as used in the Without Cause Provision, are ambiguous, that the Dealer Agreements are not completely integrated, and that the parties orally modified the Without Cause Provi-

sion. The Dealers contend that, notwithstanding the Without Cause Provision, Volvo's actions breached its implied duty of good faith and fair dealing. The Dealers also maintain that, even if the Dealer Agreements are completely integrated contracts unmodified by oral promises, Volvo is estopped from breaching its oral representations.

Finally, the Dealers contend that the Without Cause Provision is trumped by Arkansas, Louisiana, and Texas statutes that preclude manufacturers from terminating dealer agreements without cause (collectively, the "State Statutes"). The Dealers assert that, under the Local Law Provision, the Dealer Agreements are governed by the State Statutes. In the alternative, the Dealers maintain that the Choice-of-Law Provision should not be given effect because the laws selected thereunder are not rationally related to the Dealer Agreements and are contrary to the fundamental policies of their home states. Volvo maintains that the Dealers never raised this alternative contention in the district court and that it should not be considered on appeal.

We assess each of these contentions in turn.

### A.

We first consider whether the district court erred in its exercise of jurisdiction in Volvo's declaratory judgment action. In this regard, it is elementary that a federal court may properly exercise jurisdiction in a declaratory judgment proceeding when three essentials are met: (1) the complaint alleges an "actual controversy" between the parties "of sufficient immediacy and reality to warrant issuance of a declaratory judgment;" (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction. 28 U.S.C. § 2201; *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994); *N. Jefferson Square Assocs. v. Va. Hous. Dev. Auth.*, 94 F. Supp. 2d 709, 714 (E.D. Va. 2000).

Two of these three jurisdictional prerequisites, the first and the third, are contested by the Dealers on appeal. The second jurisdictional prong, that the court must possess an independent basis for jurisdiction over the parties, was satisfied when Volvo filed its Complaint and dropped defendant NFC, the only party defeating diversity.

The district court thus properly concluded that Volvo had established diversity jurisdiction in its Complaint. *Volvo Trademark*, No. 1:00CV238 (W.D.N.C. Aug. 27, 2001).

The Dealers maintain, however, that the first and third jurisdictional prongs are not met, and that the district court erred in its exercise of jurisdiction. They assert that the first prong (the "Constitutional Inquiry") is not satisfied because Volvo's actions did not create an actual controversy under the Declaratory Judgment Act. They contend that the third prong (the "Prudential Inquiry") is not met because, even if the court had jurisdiction, it abused its discretion in considering the merits of this dispute. We address these inquiries below.

1.

In assessing the Constitutional Inquiry, we look to the Declaratory Judgment Act, which provides that "[i]n a case of *actual controversy within its jurisdiction* . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201 (emphasis added). A case meets the actual controversy requirement only if it presents a controversy that qualifies as an actual controversy under Article III of the Constitution. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937) (deciding that, pursuant to statute's limitation to cases involving actual controversy, Act is operative only with respect to constitutional controversy). The Dealers contend that, although Volvo's termination notices created disputes regarding their rights to distribute Champion Motor Graders, "the termination did not create the type of trademark 'case or controversy' subject to declaratory-judgment review." As explained below, this contention is immaterial.

The Dealers first maintain that the district court lacked federal question jurisdiction because they did not take any action or make any assertion that placed Volvo in objective apprehension of the improper use of its trademark or its ability to control its trademark. For a controversy to exist for declaratory judgment purposes, however, the situation need not present a federal cause of action; if the parties are diverse, a federal court may possess subject matter jurisdiction over

a state-law contract dispute. The Dealers have admitted in their pleadings that the court had diversity jurisdiction over the North Carolina Litigation, and the existence of a contract dispute is plainly evident in the pleadings.[10] Indeed, when the court addressed the Dealers' Motion, Volvo had already been sued in Maine and Texas by Champion dealers,[11] and Volvo had already received written and oral litigation threats from the Dealers.[12]

The Dealers acknowledge that an actual controversy exists under the Declaratory Judgment Act when a plaintiff seeks declaratory relief in order to avoid the accrual of potential damages for past actions. *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 577 (7th Cir. 1994) (stating that purpose of Declaratory Judgment Act is to avoid accrual of avoidable damages to party uncertain of its rights).

---

[10]In its Complaint, Volvo sought a "declaratory judgment with respect to [its] rights and obligations under certain contracts . . . ." Complaint ¶ 3. And, in assessing whether an actual controversy existed between Volvo and the Dealers under the Complaint, the magistrate judge observed that Volvo "run[s] the risk of incurring multiple liabilities if [it does] not seek judicial interpretation and clarification of [its] rights in respect to the contracts . . . . Without a doubt, there is an active and immediate controversy among these plaintiffs and defendants . . . ." *Volvo Trademark*, No. 1:00CV238 (W.D.N.C. April 9, 2001).

[11]On February 2, 2000, Champion dealer N.A. Burkitt, Inc. initiated litigation against Volvo in the District of Maine alleging, *inter alia*, that Volvo's termination of its dealer agreement contravened the Maine Motor Vehicle Dealers Act. On August 28, 2000, a defendant in Volvo's original complaint in North Carolina (i.e., NFC) commenced litigation against Volvo in Texas, contending, *inter alia*, that Volvo could not terminate its dealer agreement without cause.

[12]The initiation of litigation against Volvo and the threats of future litigation distinguish this dispute from *North Jefferson*, a decision on which the Dealers rely. There, the district court determined that a controversy was not present under the Declaratory Judgment Act because the defendant had not taken any action, even of a preliminary nature, against the plaintiff, and the defendant had not indicated that it intended to take any future legal action against the plaintiff. *N. Jefferson*, 94 F. Supp. 2d at 718. *See generally GTE Directories Pub. Corp. v. Trimen Am., Inc.*, 67 F.3d 1563 (11th Cir. 1995) (holding that threat of future litigation gives rise to actual controversy).

When Volvo initiated its declaratory judgment action in North Carolina, it had terminated the Dealer Agreements, it had received the Dealers' litigation threats, and separate suits had been filed against it in Maine and Texas. In these circumstances, Volvo possessed a reasonable apprehension of a multiplicity of litigation and of liability for ongoing damages. An actual controversy therefore existed between Volvo and the Dealers when Volvo initiated the North Carolina Litigation. The first prong of the declaratory judgment test is thus satisfied.

2.

The Dealers next maintain that Volvo fails to satisfy the third prong of the declaratory judgment test, the Prudential Inquiry. They contend that, even if an actual controversy existed and the district court possessed an independent basis of jurisdiction, the court nevertheless abused its discretion when it exercised jurisdiction in the North Carolina Litigation.

If a district court possesses declaratory judgment jurisdiction, it may nonetheless, in the exercise of its discretion, decline to entertain the action. *See Cont'l Cas. Co.*, 35 F.3d at 965 (acknowledging that court possessed jurisdiction in declaratory judgment action and noting that critical question was whether court should have exercised its jurisdiction). The exercise of such discretion, however, is not without bounds. We have held that a district court must have "good reason" for declining to exercise its declaratory judgment jurisdiction. *Id.* As Judge Parker aptly opined years ago, a district court is obliged to rule on the merits of a declaratory judgment action when declaratory relief "will serve a useful purpose in clarifying and settling the legal relations in issue," and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937). And we have often observed that "'district courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions.'" *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998) (quoting *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998)). In these circumstances, the district court did not abuse its discretion. Its Opinion served several useful purposes: it clarified and settled Volvo's legal obligations under the

Dealer Agreements, it eliminated uncertainty regarding those agreements, and it clarified the contractual rights of the parties.[13]

The Dealers, relying on the Supreme Court's decision in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976), maintain that principles of efficiency and comity compelled the district court either to dismiss or abstain from Volvo's declaratory judgment action, in the interests of conserving judicial resources and comprehensively disposing of the litigation. We recognize that the federal trial courts should weigh the legitimate concerns of efficiency and comity when deciding whether to award declaratory relief. *Id.* As the Dealers acknowledge, however, "the first suit should have priority, absent the showing of balance of convenience in favor of the second action." *Ellicott Mach. Corp. v. Modern Welding Co., Inc.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974) (internal quotation marks and citation omitted). In this situation, as there has been no such showing, the court did not abuse its discretion in declining to defer to the Arkansas proceeding.

B.

The Dealers next maintain that Volvo breached its contractual obligations when it terminated the Dealer Agreements under its programs of Volvoization and Dealer Rationalization. More specifically, the Dealers contend that Volvo breached the Dealer Agreements when it

---

[13]The factual predicate underlying this appeal is analogous to the factual underpinnings of *Kapiloff*. There, we concluded that a "declaratory judgment action is designed to allay exactly the sort of uncertainty that flows from the threat that ambiguous contractual rights may be asserted," and we observed that a "declaratory judgment action allows the uncertain party to gain relief from the insecurity caused by a potential suit waiting in the wings." *Kapiloff*, 155 F.3d at 494.

The Dealers acknowledge that a federal court may exercise its declaratory judgment jurisdiction when a plaintiff is seeking a declaration to avoid the accrual of potential damages for past actions. *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987) (observing that declaratory judgment is available where party desires declaration of legal effect of proposed or past course of action). In this dispute, Volvo was seeking such a declaration.

began placing Volvo labels on Champion Motor Graders and when it refused to provide the Dealers with an inventory of Champion Motor Graders. As explained below, we disagree.

First and foremost, Volvo's termination of the Dealer Agreements did not constitute a breach of contract because the Without Cause Provision authorized Volvo to act as it did. When Volvo acquired Champion in 1997, Volvo assumed Champion's rights and obligations under the Dealer Agreements. Volvo was, therefore, entitled to terminate the Dealer Agreements under the Without Cause Provision.[14]

The Dealers do not contend that the express terms of the Dealer Agreements preclude Volvo from terminating their dealer contracts without cause. Instead, they contend that the Without Cause Provision

---

[14]Volvo also contends that, in the absence of the Without Cause Provision, its terminations of the Dealer Agreements would not constitute breaches of contract because "the Market Withdrawal Provision contemplates the possibility that Champion could completely disappear from the marketplace without liability following a discontinuation of the CHAMPION line of motor graders." The Market Withdrawal Provision provides:

> Champion reserves the right at any time to change models, classification of models and specifications, or add to or discontinue any products or product lines without notice to [Dealer or Distributor] and without incurring any obligation to incorporate such changes in any other products.

CLM, Clark, and FEC Dealer Agreements § 27. According to Volvo, any interpretation of the Market Withdrawal Provision that would not permit Champion to withdraw from the marketplace would render meaningless the phrase "discontinue any product or product lines." The Dealers contend, however, that in order to "withdraw from the market," Volvo would have to cease producing motor graders at the Champion factory — the simple act of relabeling does not constitute a withdrawal from the marketplace. As the district court observed, however:

> Volvo did not terminate the dealership contracts by virtue of discontinuing Champion Road motor graders or withdrawing that product from the market; the contracts were terminated pursuant to the provision . . . for termination without cause.

Opinion at 543-44.

is ambiguous and that the district court was obligated to look beyond the Dealer Agreements in determining Volvo's contractual obligations. Under South Carolina and Ontario law, which apply to CLM's and Clark's contract claims, the court did not err because (1) the Without Cause Provision is clear and unambiguous; (2) the Dealer Agreements were integrated instruments; and (3) oral promises, course of dealing, and industry custom can not alter the plain and unambiguous terms of the integrated Dealer Agreements. *See U.S. Leasing Corp. v. Janicare, Inc.*, 364 S.E.2d 202, 205 (S.C. Ct. App. 1988) (providing that, under South Carolina law, if contract contains language that imports complete legal obligation, parol or extrinsic evidence is not admissible to add to contract); *Gutierrez v. Tropic Int'l Ltd.*, 63 O.R.3d 63, 73 (Ont. C.A. 2002) (providing that, under Ontario law, evidence of collateral agreement is not admissible to contradict terms of integrated contract).

1.

Because the terms of the Dealer Agreements favor the legal position advanced by Volvo, the Dealers emphasize a series of oral promises allegedly made by Champion representatives before the Dealer Agreements were made. In South Carolina and Ontario, however, the parol evidence rule precludes the use of extrinsic evidence of prior or contemporaneous negotiations to alter, contradict, or explain the terms of the Dealer Agreements, provided the agreements are complete, unambiguous and unconditional. *See Gilliland v. Elmwood Prop.*, 391 S.E.2d 577, 581 (S.C. 1990) (applying South Carolina law); *Gutierrez*, 63 O.R.3d at 71 (applying Ontario law). Unless the Dealer Agreements are ambiguous or incomplete, oral promises or representations made to the Dealers by Champion representatives prior to execution of the Dealer Agreements have no effect on those agreements. In their appeal, the Dealers maintain that the Dealer Agreements are both ambiguous and incomplete and that the district court erred by not incorporating Volvo's oral promises into them. As explained below, we disagree.

a.

The Dealers first maintain that the Without Cause Provision is ambiguous and that the district court should have looked beyond the

four corners of the Dealer Agreements in determining Volvo's contractual obligations. The Without Cause Provision provides that "Champion *may* terminate [the] agreement at any time *without cause* by written notice of termination . . . ." CLM, Clark, and FEC Dealer Agreements § 24.4 (emphasis added). The Dealers contend that this terminology is ambiguous because it fails to define the terms "may" and "without cause" as they are used therein. To the contrary, however, there is nothing ambiguous about the term "may," and there is no ambiguity in any of the other operative terms in the Without Cause Provision. Those terms are easily and commonly understood in the English language — contract terms are rarely more plainly stated. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, No. 01-3770, 2003 WL 22519825, at *13 (7th Cir. Nov. 7, 2003) (declaring contract language permitting dealer agreement to be terminated at any time without cause to be unambiguous).[15]

The Dealers contend, however, that the ambiguity of the Without Cause Provision is apparent when examined in the context of Section 24 of the Dealer Agreements. More specifically, the Dealers maintain that the "may terminate" language of the Without Cause Provision contrasts sharply with the "shall terminate automatically" language found in Subsection 24.5. As the district court noted in its Opinion, however, this distinction relates to the fact that termination under the Without Cause Provision is discretionary and occurs only after sixty days notice. Opinion at 545. A termination under Subsection 24.5, by contrast, is non-discretionary, and it occurs automati-

---

[15]The Seventh Circuit's decision in *Cromeens* was filed on November 7, 2003, a month after this appeal was argued. One of the issues in *Cromeens* was whether, under their programs of Volvoization and Dealer Rationalization, AB Volvo, Volvo Excavators AB, and Volvo Construction Equipment NV could terminate the dealers of Samsung construction equipment without cause. The dealer agreements in *Cromeens* contained a termination clause analogous to the Without Cause Provision. *Cromeens*, 2003 WL 22519825, at *11. On appeal, the Samsung dealers maintained that the "without cause" provision in the Samsung dealer agreements was ambiguous. The Seventh Circuit rejected this contention, ruling that the language of the "without cause" provision "could not be more plain." *Id.* at *13. The Seventh Circuit then concluded that the dealer agreements unambiguously permitted termination of the Samsung dealers without cause. *Id.*

cally upon the occurrence of a certain event, such as when a dealer files for bankruptcy.

The Dealers also maintain that the ambiguity of the term "without cause" is apparent when examined in the context of Section 24. The Dealers contend that, because Section 24 otherwise provides when Champion can terminate the Dealer Agreements for cause, the term "cause" in the Without Cause Provision should be interpreted to mean a cause not otherwise provided for in Section 24. As the Eleventh Circuit has observed, however, the fact that both "with cause" and "without cause" termination provisions are contained in the same section of a contract only shows that the parties differentiated between termination for cause and termination without cause. And when a contract contains both "for cause" and "without cause" provisions, a party may terminate a contract, even in the absence of breach or fault by the other party, pursuant to the without cause provision. *Harris Corp. v. Giesting & Assocs., Inc.*, 297 F.3d 1270, 1273 (11th Cir. 2002). We agree with the district court; the Without Cause Provision is "clear, specific and unambiguous." Opinion at 546.

b.

The Dealers next maintain that, because the Dealer Agreements are incomplete, evidence of promises made by Champion representatives prior to execution of the Dealer Agreements are not barred by the parol evidence rule. In this regard, a court applying South Carolina or Ontario law is obliged to consider a writing as complete if "the writing on its face appears to express the whole agreement." *U.S. Leasing Corp.*, 364 S.E.2d at 205; G. H. L. Fridman, *Law of Contract in Canada* 22 (4th ed. 1999). In addition, we are entitled to consider an integration clause in weighing whether contracting parties intended a written contract to constitute the entirety of an agreement. *Gilliland*, 391 S.E.2d at 581; *Gutierrez*, 63 O.R.3d at 73. In this situation, the Dealer Agreements are detailed and explicit, and each contains the Integration Clause providing that the writing is "the entire and only agreement between the parties respecting the . . . purchase and distribution" by the Dealers of Champion products and parts.[16] Further-

---

[16]The Integration Clause specifically provides:

more, the Dealer Agreements emphasize that "terms or conditions in connection therewith not incorporated herein shall not be binding upon either party." Finally, the agreements provide that they cancel, terminate, and supersede all previous agreements entered into between the parties. CLM and Clark Dealer Agreements § 32.1; FEC Dealer Agreement § 33.1.

In these circumstances, the Dealer Agreements are both unambiguous and integrated. As such, we agree with the district court on the parol evidence issue. The parol evidence rule bars the Dealers from utilizing oral representations made prior to contract execution to modify or contradict the terms of the Dealer Agreements. Opinion at 546.

2.

The Dealers next maintain that subsequent oral promises, made by Champion and Volvo representatives *after* the Dealer Agreements were executed, altered the terms thereof. Volvo acknowledges that the parol evidence rule does not bar the use of such promises; it maintains, however, that the Modification Clause precludes their use here. Pursuant to the Modification Clause, any modification of a Dealer Agreement is invalid unless it is in writing and signed by an authorized Champion officer.[17] In response to Volvo's reliance on the Mod-

---

This agreement and [any] accompanying Exhibits contain the entire and only agreement between the parties respecting the sale to and purchase and distribution by [Dealer or Distributor] of Products and Parts, and any representations, terms or conditions in connection therewith not incorporated herein shall not be binding upon either party. This agreement wholly cancels, terminates and supersedes any agreement heretofore entered into between the parties, or their successors or assigns, pertaining to Products and Parts.

CLM and Clark Dealer Agreements § 32.1; FEC Dealer Agreement § 33.1.

[17] The Modification Clause provides:

This agreement, and any modification, renewal, waiver, extension or termination hereof, shall not be valid unless in writing and signed by a duly authorized officer of Champion.

FEC Dealer Agreement § 33.2; CLM and Clark Dealer Agreements § 32.2 (omitting "waiver").

ification Clause, the Dealers assert that a "no oral modification clause" may itself be orally modified, validating subsequent unwritten modifications. This position must also fail, however, because, pursuant to South Carolina and Ontario law, an oral modification of a written contract must be supported by separate and adequate consideration. *See Evatt v. Campbell*, 106 S.E.2d 447, 449-50 (S.C. 1959) (observing that written contract may be changed by subsequent parol agreement supported by valuable consideration); *Francis v. Canadian Imperial Bank of Commerce*, 21 O.R.3d 75, 83 (Ont. C.A. 1994) (recognizing principle of contract law that additional consideration is required to support modification of existing agreement).

The Dealers' sole basis for contending that they provided separate and adequate consideration in support of modification of the Modification Clause is that they continued to market Champion Motor Graders after Champion was purchased by Volvo. Although the Dealers may have made good faith efforts to market Champion Motor Graders after Champion's purchase by Volvo, such efforts could not constitute consideration in support of an oral modification because, under the Best Efforts Provision, the Dealers had a preexisting contractual obligation to make such efforts. *Rabon v. State Fin. Corp.*, 26 S.E.2d 501, 502 (S.C. 1943) (observing that, pursuant to South Carolina law, agreement to do what one is already legally bound to do is not sufficient consideration to support new agreement); *Francis*, 21 O.R.3d at 82 (observing that, under Ontario law, agreement to perform preexisting duty does not constitute new consideration). In such circumstances, the Dealers' contention of subsequent oral modification of the Dealer Agreements must fail.

3.

In their final effort to convince us to read additional terms into the Dealer Agreements, the Dealers contend that, in defining the parties' obligations under the Dealer Agreements, we should look to the course of dealing between the parties and to industry custom regarding heavy equipment dealer franchises. Although courts commonly look to evidence of the course of dealing and to industry custom and usage in assessing ambiguous contract terms, under South Carolina and Ontario law, "extrinsic evidence of a usage or custom is not admissible where the contract expresses the intent of the parties in

clear and unambiguous language." *U.S. Leasing Corp.*, 364 S.E.2d at 206; *see Gutierrez*, 63 O.R.3d at 71 (concluding that extrinsic evidence is not admissible to vary terms of clear and unambiguous contract). The terms of the Dealer Agreements are clear and unambiguous, and we must decline to modify them on the basis of either course of dealing or industry custom.

### 4.

Finally, the Dealers contend that Volvo breached its implied duty of good faith and fair dealing when it refused to supply them with Champion Motor Graders. In South Carolina and Ontario, however, there can be no breach of an implied covenant of good faith and fair dealing where "a party to a contract [does] what provisions of the contract expressly [give] him the right to do." *Adams v. G.J. Creel & Sons, Inc.*, 465 S.E.2d 84, 85 (S.C. 1995); *see Peel Condo. Corp. No. 505 v. Cam-Valley Homes, Ltd.*, 53 O.R.3d 1, 16 (Ont. C.A. 2001) (holding that covenant of good faith and fair dealing is circumscribed by terms of contract). In this regard, the Dealer Agreements gave Champion, and therefore Volvo, the right to terminate the Dealer Agreements without cause. In terminating the Dealer Agreements, then, Volvo could not have breached its duty of good faith and fair dealing.

### C.

The Dealers maintain that, even if the Dealer Agreements are completely integrated contracts unmodified by the promises of Champion and Volvo representatives, Volvo is estopped from breaching its oral promises. The Dealers' estoppel theory is without merit. Promissory estoppel is simply not a cause of action recognized in Ontario. *See Gilbert Steel, Ltd. v. Univ. Constr., Ltd.*, 12 O.R.2d 19, 23 (Ont. C.A. 1976) ("[E]stoppel can never be used as a sword but only as a shield. A plaintiff cannot found his claim in estoppel."). And in South Carolina, equitable relief is precluded under a theory of promissory estoppel if the estoppel claim is in direct conflict with a specific contract term. *See Charleston County Sch. Dist. v. Laidlaw Transit, Inc.*, 559 S.E.2d 362, 364-65 (S.C. Ct. App. 2001) (holding that party who acknowledges being bound by contract cannot recover in equity under theory of promissory estoppel if estoppel claim is in direct conflict

with contract term). CLM's and Clark's estoppel claims are barred under South Carolina law, therefore, because they conflict with the Without Cause Provision.

## D.

We next turn to the Dealers' contentions regarding the State Statutes. The Dealers maintain that, notwithstanding the Without Cause Provision, Volvo was prohibited by the State Statutes from terminating the Dealer Agreements without good cause. More specifically, Clark contends that the Arkansas Franchise Act (the "Arkansas Act") prohibited Volvo from terminating its Dealer Agreement (Ark. Code § 4-72-201, *et seq.*); CLM maintains that Volvo's termination of its Dealer Agreement was prohibited by the Louisiana Dealer Act (the "Louisiana Act"; La. Rev. Stat. § 51:481, *et seq.*); and FEC alleges that both the Texas Farm, Industrial and Outdoor Power Equipment Dealer Act (the "Equipment Act"; Tex. Bus. & Com. Code § 19.01, *et seq.*) and the Texas Deceptive Trade Practices and Consumer Protection Act (the "DTPA"; Tex. Bus. & Com. Code § 17.41, *et seq.*) precluded Volvo's termination of its Dealer Agreement.

A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941) (observing that forum state's choice-of-law rules are substantive). And when a lawsuit is transferred from one federal court to another pursuant to 28 U.S.C. § 1404(a), the transferee court is obliged to apply the choice-of-law rules that the transferor court would have applied. *Van Dusen v. Barrack*, 376 U.S. 612, 632-37 (1964). This transfer, however, was not a typical § 1404(a) convenience-of-the-witnesses transfer. Instead, the Arkansas Litigation was transferred to North Carolina because the North Carolina court declined to defer to the Dealers' later filed Arkansas case. The North Carolina Litigation was first filed, venue was proper in the Western District of North Carolina, and that court possessed jurisdiction over all the parties. The North Carolina court's decision that it need not defer to the Arkansas court, therefore, was entirely proper. Under these circumstances, and in light of the principles animating the Supreme Court's decision in *Van Dusen*, we are not at all sure that

the *Van Dusen* precedent should be blindly and mechanically applied, as the Dealers would have us do. *See Van Dusen*, 376 U.S. at 635-36 ("The legislative history of § 1404(a) certainly does not justify the rather startling conclusion that one might get a change of law as a bonus for a change of venue. Indeed, an interpretation accepting such a rule would go far to frustrate the remedial purposes of § 1404(a). If a change of law were in the offing, the parties might well regard the section primarily as a forum-shopping instrument.").

Moreover, the claims asserted by the Dealers in the Arkansas Litigation are mirror images of their counterclaims in the North Carolina Litigation. Thus, applying Arkansas law to the Arkansas claims and North Carolina law to the North Carolina counterclaims could (in theory, at least) lead to different results on identical claims. It therefore seems clear that the choice-of-law rules of only one state should be applied to this action. For example, in *Boardman Petroleum, Inc. v. Federated Mutual Insurance Co.*, 135 F.3d 750 (11th Cir. 1998), an insurer and its insured filed separate actions in the federal courts of different states, both raising the question of whether coverage existed under an insurance policy. The insurer's action was transferred from South Carolina to Georgia, where the insured's action was pending, and the proceedings were consolidated. The Eleventh Circuit applied *Van Dusen* but nonetheless concluded that "of necessity, only one state's law may be applied" to the consolidated case. *Id.* at 753; *see also Bott v. Am. Hydrocarbon Corp.*, 441 F.2d 896, 899-900 (5th Cir. 1971) ("[W]hen the California action was transferred to Texas the California law went with it. But this is only the first step, because the Texas District Court found pending before it two separate but identical actions between the same parties, which it consolidated. . . . The Texas court could not try the consolidated cases under two sets of laws if to do so would produce differing results. If there was a conflict, it was required to make a choice of law.").

In any event, we need not definitively decide how this thorny issue should be resolved, because the choice-of-law principles of North Carolina and Arkansas are sufficiently similar that the outcome of this dispute would be the same under either set of rules. Both North Carolina and Arkansas typically give effect to contractual choice-of-law provisions. *See Torres v. McClain*, 535 S.E.2d 623, 625 (N.C. App. 2000) (holding that parties' choice of law is generally binding); *In re*

*Jones*, 231 B.R. 66, 68 (Bankr. E.D. Ark. 1999) (observing that Arkansas courts will generally uphold contract's choice of law). In addition, as discussed in more detail later, both Arkansas and North Carolina rely on the Restatement (Second) of Conflict of Laws (1971) (the "Second Restatement") to determine the circumstances under which a contractual choice-of-law provision will be given effect. *See Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 574 S.E.2d 31, 33-34 (N.C. Ct. App. 2002); *S. Farm Bureau Cas. Ins. Co. v. Craven*, 89 S.W.3d 369, 372 (Ark. Ct. App. 2002). Accordingly, in the interest of simplicity, and because it will not affect the outcome of this proceeding, we will approach this dispute through the prism of North Carolina's choice-of-law rules.

In support of their contentions regarding the State Statutes, the Dealers rely on the presumptive rule of *lex loci contractus*, that is, the interpretation of a contract is governed by the law of the place where it was made. *See Tanglewood Land Co., Inc. v. Byrd*, 261 S.E.2d 655, 656 (N.C. 1980) (observing presumption that interpretation of contract is governed by law of place where contract was made). Under North Carolina law, however, such a presumption may be overcome by the presence of a choice-of-law provision in a contract. *See Bueltel v. Lumber Mut. Ins. Co.*, 518 S.E.2d 205, 209 (N.C. App. 1999) (noting that, when contract contains choice-of-law provision, parties intended exception to presumptive rule that law of place where contract made governs). In this situation, the Dealer Agreements each contain a Choice-of-Law Provision.[18]

---

[18]The Choice-of-Law Provision in the Clark and CLM Dealer Agreements provides:

> This Agreement has been formalized in South Carolina, and the rights, duties and obligations of the parties as set forth herein shall be determined according to the laws of the State of South Carolina.

CLM and Clark Dealer Agreements § 29. The Choice-of-Law Provision in the FEC agreement provides:

> This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the Province of Ontario.

FEC Dealer Agreement § 29.

Recognizing the difficultly presented by that provision, the Dealers attack Volvo's position that the Dealer Agreements are governed solely by South Carolina and Ontario law. First, the Dealers contend that the Local Law Provision is also a choice-of-law clause and that, pursuant thereto, the Dealer Agreements are governed by the State Statutes. Second, the Dealers maintain that, if the Dealer Agreements are not governed by the State Statutes under the Local Law Provision, the Choice-of-Law Provision is invalid because the law selected thereunder contravenes the fundamental policies of their home states. We address these contentions below.

1.

The Dealers first contend that there are, in effect, two choice-of-law clauses in each Dealer Agreement — the Choice-of-Law Provision (§ 29) and the Local Law Provision (§ 30). The Dealers maintain that these two clauses are reconcilable because the drafters of the Dealer Agreements could have intended the Choice-of-Law Provision to be applicable only in the absence of local law governing the agreements. The Dealers contend that, because these two provisions are reconcilable, it would be error to give effect to one clause but not the other. As explained below, these contentions are without merit.

Under the Local Law Provision, the rights and obligations created by the Dealer Agreements are subject to all applicable laws, orders, and regulations of governments and government agencies having jurisdiction over the parties. If a contracting party believes that a local law substantially alters the relationships established by its Dealer Agreement, that party may request the other party to modify the agreement.[19] According to Volvo, the State Statutes, if applied, would

---

[19]The Local Law Provision provides:

The rights and obligations of the parties hereto shall be subject to all applicable laws, orders, regulations, directions, restrictions and limitations of governments and government agencies having jurisdiction over the parties hereto. In the event that [a local] law, order, regulation, direction, restriction or limitation, appropriation, . . . or interpretation thereof shall, in the judgment of either party hereto substantially alter the relationship between the parties under this Agreement or the advantages derived from such relationship, *either party may request the other hereto to modify this Agreement*.

CLM, Clark, and FEC Dealer Agreements § 30 (emphasis added).

effectively nullify the Without Cause Provision, substantially altering the relationship between Champion and the Dealers. We agree.

The Local Law Provision provides a ready mechanism for the Dealers to request that the Dealer Agreements be modified. If the Dealers had viewed the State Statutes as substantially altering the relationships between the parties under the Dealer Agreements, they were entitled to request Champion (or Volvo) to modify the agreements; the Local Law Provision expressly provided them with this right. The Dealers did not, however, seek to modify the Dealer Agreements so that they could be terminated only "for good cause," and they cannot now maintain that, under the Local Law Provision, they are protected by the State Statutes.[20]

2.

In their second assault on the Choice-of-Law Provision, the Dealers maintain that application of South Carolina law (under the Clark and CLM Dealer Agreements) and Ontario law (under the FEC Dealer Agreement) is unreasonable and contravenes the fundamental policies of Arkansas, Louisiana, and Texas. Despite North Carolina's adherence to the presumptive rule of *lex loci contractus*, contracting parties in North Carolina are entitled to agree that a particular jurisdiction's substantive law will govern their contract, and such a provision will generally be given effect. *See Torres*, 535 S.E.2d at 625 (holding that

---

[20]In support of their contention that the Local Law Provision mandates that the State Statutes govern the Dealer Agreements, the Dealers rely on two decisions, *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401 (9th Cir. 1992), and *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192 (5th Cir. 2003). Their reliance on these decisions, however, is misplaced. The agreement at issue in *Sutter Home* expressly provided that, "*[e]xcept as otherwise required by applicable law*, this Agreement shall be governed by the law of the State of California." *Sutter Home*, 971 F.2d at 406 (emphasis added). This language is absent from the Dealer Agreements. The agreement at issue in *Lake Charles* provided that "any provision which contravenes the laws of any state or jurisdiction where this Agreement is to be performed will be deemed not a part of this Agreement in such state or jurisdiction." *Lake Charles*, 328 F.3d at 197 n.10. No such provision exists in the Dealer Agreements.

parties' choice of law is generally binding).[21] In certain circumstances, however, North Carolina will decline to honor a choice-of-law provision. North Carolina relies on the Second Restatement to determine whether such circumstances are present. *See Cable Tel Servs.*, 574 S.E.2d at 33-34. Pursuant to § 187 of the Second Restatement, a choice-of-law provision will not be enforced if either of the following two conditions is satisfied:

> (a)   the chosen state *has no substantial relationship* to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b)   application of the law of the chosen state would be *contrary to a fundamental policy* of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . .

Second Restatement § 187 (emphasis added). The Dealers maintain that the Choice-of-Law Provision does not apply here because it contravenes both prongs of the § 187 test. They contend, first, that there is no substantial relationship between South Carolina and the Clark and CLM Dealer Agreements (the "Substantial Relationship" issue), and, second, that application of South Carolina or Ontario law to those agreements would contravene the fundamental policies of Arkansas, Louisiana, and Texas (the "Fundamental Policy" issue).

   Before addressing this aspect of the Dealers' assault on the Choice-of-Law Provision, we must assess whether Volvo is correct in its contention that the Substantial Relationship and Fundamental Policy issues were not properly raised in the district court. If those issues are properly before us, we must determine whether the Dealers are protected by the State Statutes.

---

[21]We recognize that the "Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity." *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996).

a.

Volvo contends that the Substantial Relationship and Fundamental Policy issues were not raised in the district court. Absent exceptional circumstances, of course, we do not consider issues raised for the first time on appeal. *Williams v. Prof'l Transp. Inc.*, 294 F.3d 607, 614 (4th Cir. 2002) (citing *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993)). Indeed, we consider such issues on appeal only when the failure to do so would result in a miscarriage of justice. *Muth*, 1 F.3d at 250.

In support of its contention, Volvo relies on an observation in the Opinion that the Dealers and the Dealer Agreements may not bear a reasonable relationship to South Carolina or Ontario. The court declined to decide whether such a reasonable relationship existed, however, concluding that the Dealers had not raised the Substantial Relationship issue. Opinion at 542 n.5. The Dealers maintain that Volvo has mischaracterized the record on this point, and they contend that the Substantial Relationship and Fundamental Policy issues were raised in the district court. In support of their position that these issues were properly raised, the Dealers point to memoranda filed on October 23, 2002 (the "October Response"), in which they maintained:

> all the Dealers are protected by dealer protection statutes enacted by their own state legislatures to protect them from the precise action that Volvo is seeking to undertake. . . . all but one of the applicable statutes contain 'non-waiver' provisions — meaning that the contract simply cannot be seen as circumventing the statute.

In the October Response, the Dealers asserted that, because some of the State Statutes contain anti-waiver provisions, the Dealers are protected by them, despite the presence of the Choice-of-Law Provision in the Dealer Agreements. In assessing whether an issue was properly raised in the district court, we are obliged on appeal to consider any theory plainly encompassed by the submissions in the underlying litigation. *See Maynard v. Gen. Elec. Co.*, 486 F.2d 538, 539 (4th Cir. 1973). In this circumstance, the October Response plainly encompasses the contention that certain of the State Statutes contain anti-waiver provisions (namely the Arkansas Act, the Texas Equipment

Act, and the Texas DTPA), and that protection of the Dealers under these statutes cannot be circumvented by the Choice-of-Law Provision. We will therefore consider this contention on appeal. The Dealers acknowledged in the October Response, however, that one of the State Statutes (i.e., the Louisiana Act) does not contain an anti-waiver clause. Rather than raising the issue of whether the Louisiana Act sets forth a fundamental policy of Louisiana, and therefore trumps the Choice-of-Law Provision, the Dealers asserted that the Act governs CLM's Dealer Agreement because of the Local Law Provision. Although the Dealers failed to assert in the district court that the Louisiana Act expresses a fundamental policy of Louisiana, the court addressed this point in determining whether the Louisiana Act precluded Volvo's termination of the CLM Dealer Agreement without cause. Opinion at 554. Because the question of whether the Louisiana Act expresses fundamental state policy was decided by the district court, that issue is properly before us on appeal. *Home Health Servs., Inc. v. Currie*, 706 F.2d 497, 498 (4th Cir. 1983) (observing that issue may be considered on appeal if it was argued below or specifically decided by district court).

We next consider whether the Substantial Relationship issue was properly raised below. On this point, the pleadings fail to plainly encompass the contention that there is no substantial relationship between the law selected under the Choice-of-Law Provision, on the one hand, and the parties or the Dealer Agreements, on the other. We therefore agree with the district court — the Dealers did not properly raise the Substantial Relationship issue below. Opinion at 542 n.5. Moreover, the Dealers have presented us with no reason to believe that declining to address this issue on appeal will result in a miscarriage of justice.

b.

Next, before assessing whether the State Statutes constitute fundamental policies of Arkansas, Louisiana, or Texas and thus govern the Dealer Agreements, we must decide whether the Dealers are protected parties under those statutes. If a Dealer is protected by one of the State Statutes, we must then determine whether the statute also applies to Champion Motor Graders.

(1)

We first consider whether FEC can assert a claim under the Texas Equipment Act, which provides that a manufacturer may not terminate a dealer agreement except for cause. Tex. Bus. & Com. Code § 19.41. As the district court ruled, however, FEC cannot state a claim under the Texas Equipment Act because FEC is not a party protected by it. When FEC acquired its Champion dealership in 1996, the Texas Equipment Act excluded from its protection those "person[s] whose principal business is the sale of off-road construction equipment." *Id.* § 19.01(5) (originally enacted as Act of May 19, 1991, 72nd Leg., ch. 119, § 1), *amended by* Act of Sept. 1, 1999, 76th Leg., ch. 725, § 2. The court concluded that FEC could not state a claim under the Texas Equipment Act because Champion Motor Graders constituted off-road construction equipment.[22] Opinion at 553. We agree. Because FEC is unable to state a claim under the Texas Equipment Act, we need not address the question of whether its provisions constitute a fundamental policy of Texas.

(2)

We next turn to the issue of whether FEC can state a claim under the Texas DTPA, which provides protection only to "consumers." *See Kennedy v. Sale*, 689 S.W.2d 890, 892-93 (Tex. 1985) (noting that DTPA is designed to protect only "consumers," as that term is defined therein). Under the DTPA, "a consumer is one who seeks or acquires, by purchase or lease, any goods or services." *Rayford v. Maselli*, 73 S.W.3d 410, 411 (Tex. App. 2002) (citing Tex. Bus. & Com. Code Ann. § 17.45(4)). On appeal, FEC maintains that it is a consumer under the DTPA, and that the district court erred in ruling that it could

---

[22]In 1999, the Texas Legislature amended the Texas Equipment Act so that a "dealer" under the Act included dealers engaged in the retail sale of off-road construction equipment. The Legislature provided, however, that "[a]n agreement entered into before the effective date of this Act [Sept. 1, 1999] *is governed by the law in effect on the date the agreement was entered into . . . .*" 1999 Tex. Gen. Laws § 4, 76th Leg., Ch. 725 (emphasis added). FEC acquired its Champion dealership in 1996; thus the 1999 amendments to the Texas Equipment Act have no application to its Dealer Agreement.

not state a claim under that statute. In assessing whether the court erred in so ruling, we must ascertain and follow the substantive law of Texas. *See Erie*, 304 U.S. at 78-79.

In its Opinion, the court relied heavily on the Texas decision in *Fisher Controls International, Inc. v. Gibbons*, 911 S.W.2d 135 (Tex. App. 1995), and it ruled that FEC was not a consumer under the DTPA.[23] In *Fisher*, the owner ("Gibbons") of a company engaged in the resale of valves and instruments ("ACI") sued the company's supplier ("Fisher"), alleging a violation of the DTPA. ACI was an independent sales representative for Fisher. In his DTPA claim, Gibbons alleged that Fisher had falsely promised to extend ACI's agreement beyond the three years expressly provided in its contract, and that Fisher failed to inform ACI of Fisher's long-term business plan to terminate its independent representatives (such as ACI). *Id.* at 139 n.1. Although the jury found for Gibbons, the trial court granted judgment notwithstanding the verdict, concluding that ACI was not a consumer under the DTPA.

The Texas Court of Appeals began its analysis of whether ACI was a consumer by noting that ACI was authorized, under the agreement, to "buy Fisher products at a discount and resell them on its own behalf." *Id.* at 139. The court ruled, however, that despite being authorized to buy Fisher products, ACI was not a consumer under the DTPA. The court observed that ACI's DTPA complaint was premised on ACI's "intangible property right . . . to act as Fisher's sales representative under the 'Representative Agreement,'" rather than the quality of Fisher's products. *Id.* at 138-39. In ruling for Volvo, the district

---

[23]The Supreme Court of Texas, the court possessing the final authority in all Texas civil cases, has not addressed the issue of whether, pursuant to a dealer agreement analogous to FEC's, a vendee is a consumer under the DTPA. Because there is no reason to believe the Supreme Court of Texas would disagree with the Texas Court of Appeals (an intermediate appellate court of Texas) on this issue, we must rely on that court in discerning Texas law. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (holding that state intermediate appellate court's judgment on rule of law is datum for ascertaining state law and should not be disregarded by federal court unless it is convinced by persuasive data that highest court of state would decide otherwise).

court concluded that the *Fisher* decision was controlling because there is no material distinction between the arrangement in *Fisher* and the arrangement between FEC and Volvo.[24] We agree. FEC's complaint is based on its asserted intangible right to be a Champion dealer, not the quality of Champion Motor Graders. Opinion at 552.

FEC maintains that, under the Texas decision in *Texas Cookie Co. v. Hendricks & Peralta*, 747 S.W.2d 873 (Tex. App. 1988), it is nonetheless a consumer protected by the Texas DTPA. Under *Texas Cookie*, a business possessing an intangible right analogous to that in *Fisher* (i.e., the contract right to be a dealer of a manufacturer's goods in a certain geographic area) may be a consumer under the DTPA if (1) the business purchased the intangible right, and (2) the business's decision to purchase the right was motivated, in part, by its desire to obtain collateral services under the dealer agreement. *Fisher*, 911 S.W.2d at 139 (citing *Tex. Cookie*, 747 S.W.2d at 876-77).

FEC is not a consumer under the DTPA, however, because FEC did not *purchase* an intangible right to be a Champion dealer, and the collateral services provided under the Dealer Agreement were merely incidental to the agreement. *See id.* (concluding that, because collateral services provided ACI under contact were incidental to transaction rather than its objective, ACI was not consumer under DTPA). As the district court observed, FEC does not allege that it paid for an intangible right to continue to be a Champion dealer, and no payment is reflected in the Dealer Agreement. Opinion at 552. In addition, receipt of collateral services provided to FEC by Champion was not an objective of the Dealer Agreement. The collateral services Champion provided to the Dealers included sales advice, catalogues, manuals, instruction booklets, and advertising signs, and the Dealer Agreement provided that all demonstration equipment furnished by Champion "remain[s] the property of Champion." FEC Dealer Agreement § 14. These collateral services were, therefore, merely incidental to FEC's objective of being an authorized Champion dealer, and the

---

[24]Under both the dealer agreement in *Fisher* and FEC's Dealer Agreement, the relationship between the manufacturer and dealer was that of vendor and vendee. FEC Dealer Agreement § 21. And like the valves and instruments provided to ACI by Fisher, Champion Motor Graders were sold to FEC at dealer net prices for resale. *Id.* §§ 9.1, 12.4.

court properly determined that FEC was not a consumer under the DTPA. Opinion at 552. As such, FEC is unable to assert a claim under the DTPA, and we need not reach the issue of whether the DTPA constitutes a fundamental policy of Texas.

(3)

Next, we assess whether Clark or CLM can state a claim under the Arkansas Act or the Louisiana Act, respectively. In the district court, Volvo maintained that Clark was not protected by the Arkansas Act and that CLM was not protected by the Louisiana Act because, pursuant to the Choice-of-Law Provision, Clark's and CLM's Dealer Agreements are governed by South Carolina law. Volvo did not, however, assert that the statutes in question, by their terms, fail to apply to Clark's or CLM's Dealer Agreements. Absent the Choice-of-Law Provision, Clark could state a claim under the Arkansas Act, and CLM could state a claim under the Louisiana Act. We must therefore decide whether either statute embodies a fundamental state policy.

c.

Under the Second Restatement, North Carolina will not honor a choice-of-law provision if the law of the chosen state is contrary to the fundamental policy of a state possessing a greater interest in the issue than the chosen state (the "Fundamental Policy" test). *See Cable Tel Servs.,* 574 S.E.2d at 33-34 (quoting § 187 and noting that it has been incorporated into North Carolina common law). Pursuant thereto, unless the Choice-of-Law Provision in either Clark's or CLM's Dealer Agreement satisfies the Fundamental Policy test, it does not deprive Clark or CLM of protection under the Arkansas Act or the Louisiana Act, respectively.

In this regard, Clark and CLM maintain that Volvo's termination of their Dealer Agreements without cause contravenes fundamental state policies. More specifically, they contend that the law selected under the Choice-of-Law Provision is contrary to the Arkansas Act and the Louisiana Act, that these statutes constitute fundamental state policy, and that the Choice-of-Law Provision therefore fails the Fundamental Policy test.

In order to determine whether the law selected under the Choice-of-Law Provision fails the Fundamental Policy test, we must first determine whether either the Arkansas Act or the Louisiana Act expresses a fundamental state policy. In addressing this issue, we begin with the proposition that not every statutory provision constitutes a fundamental policy of a state. *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 252 (5th Cir. 1994) ("The law of a state and its public policy are not necessarily synonymous. Not every law enacted by the legislature embodies the 'public policy' of the state.").[25]

(1)

In assessing whether a dealer protection statute expresses a state's fundamental policy, we are guided by the language of the statute, relevant court decisions, and pertinent legislative history.[26] In particular here, we are aided by several recent decisions of our sister circuits regarding similar controversies. *See Cromeens*, 2003 WL 22519825 (determining that Maine franchise statute evidenced strong public policy against contracts violating franchise law, and that protection under such statute may not be waived); *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128 (7th Cir. 1990) (determining that Indiana franchise law expressed fundamental policy, and that protection under Indiana franchise law may not be waived); *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734 (8th Cir. 1989) (en banc) (holding that protection under Minnesota franchise law may be waived because law does not embody fundamental policy); *Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120 (6th Cir. 1987) (holding

---

[25]If every statutory provision expressed a state's fundamental policy, contracting parties would be entitled to apply the law of another state under the Second Restatement only when the law of the chosen state was the same as that of the state where the contract was made. *Cherokee Pump & Equip. Inc.*, 38 F.3d at 252 (characterizing such proposition as "ridiculous").

[26]We note that, in assessing whether the Arkansas Act or the Louisiana Act embodies a fundamental state policy, we would be bound by any relevant precedent of the Arkansas or Louisiana courts. Because there is none, and because our Court has not heretofore addressed such an issue, we are constrained to examine the decisions of our sister circuits addressing these and similar dealer protection statutes.

that protection under Ohio business statute may be waived because statute does not embody fundamental policy).

The Sixth, Seventh, and Eighth Circuits have, in their analyses of similar issues, focused on whether state dealer protection statutes contain anti-waiver provisions. The Arkansas Act contains such a provision, and Clark maintains that its inclusion reflects that the Arkansas Act constitutes a fundamental policy of Arkansas.[27] In espousing this proposition, Clark relies primarily on the Seventh Circuit's decision in *Wright-Moore*. There, the court held that an Indiana franchise statute containing an anti-waiver provision constituted a fundamental policy of Indiana and barred contracting parties from opting out of its protection "whether directly through waiver provisions or indirectly through choice of law." *Wright-Moore*, 908 F.2d at 132. As the Sixth and Eight Circuits have observed, however, the presence of a statutory anti-waiver provision does not *necessarily* mean that a statute embodies a state's fundamental policy. *See Tele-Save*, 814 F.2d 1120; *Modern Computer*, 871 F.2d 734.

There is no established rule for determining whether a state policy is fundamental. Although the presence of an anti-waiver provision does not necessarily mean that a dealer protection statute embodies a fundamental policy, such a provision suggests the importance the legislature attached to the statute. The strength of anti-waiver provisions in dealer protection statutes, however, varies among the states. *Wright-Moore*, 908 F.2d at 134. Following the lead of our sister circuits, we will determine whether the Arkansas Act expresses fundamental policy by first assessing the strength of its anti-waiver provision. *See Wright-Moore*, 908 F.2d at 134; *Modern Computer*, 871 F.2d at 738; *Tele-Save*, 814 F.2d at 1122-23; *see also Jeffries v. Woodruff County*, 205 S.W.2d 194, 196 (Ark. 1947) (observing that, in Arkansas, public policy is determined by examining constitution, statutes, and court decisions). We will also focus on any legislative history indicating whether the Arkansas Act was intended to embody a fundamental policy of Arkansas. *See Cromeens*, 2003 WL 22519825, at *9-10; *see also Jordan v. Atl. Cas. Ins. Co.*, 40 S.W.3d 254, 257 (Ark. 2001) (observing that, in Arkansas, determination of

---

[27]Unlike the Arkansas Act, the Louisiana Act does not contain an anti-waiver provision.

public policy lies almost exclusively with legislature, and courts should not interfere with that determination absent palpable error). Because the Louisiana Act does not have an anti-waiver provision, we must, in seeking to determine whether the Act was intended to embody a fundamental policy of Louisiana, focus on its provisions and on any relevant court decisions.

(2)

In assessing whether the Louisiana Act constitutes a fundamental policy of Louisiana, we look to pertinent Louisiana judicial and legislative authorities. Because the Louisiana courts have not addressed this issue, our analysis is limited to the text of the statute. *Cherokee Pump*, 38 F.3d at 253 (observing that court decisions fail to show that Louisiana Act reflects public policy of Louisiana). Unlike the dealer protection statutes of certain other states, the Louisiana Act does not contain an anti-waiver provision. More importantly, nothing in the Act indicates that it was enacted to foster or protect a fundamental policy of Louisiana. *See Cherokee Pump*, 38 F.3d at 253 (observing that Louisiana Act fails to indicate that "strongly held belief" or "public policy" of Louisiana was being fostered or protected by its enactment). In this regard, the Louisiana legislature clearly understood the significance of a statutory provision indicating that a statute represents important state policy. For example, in the Louisiana Oilfield Indemnity Act, the legislature indicated its intent "to declare *null and void and against public policy of the state of Louisiana any provision in any agreement* which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault . . . on the part of the indemnitee . . . ." La. Rev. Stat. § 9:2780 (emphasis added). No such provision is found in the Louisiana Act.

In the absence of an anti-waiver provision in the statute, and there being no legislative finding that the Louisiana Act constitutes an important, much less a fundamental, state policy, we agree with the Fifth Circuit that the Act cannot override a choice-of-law contract provision precluding its application. *Cherokee Pump*, 38 F.3d at 252. Because the body of law selected in CLM's Choice-of-Law Provision does not fail the Fundamental Policy test, that law, rather than the Louisiana Act, governs the obligations of the parties.

(3)

Finally, we turn to the issue of whether the Arkansas Act embodies a fundamental policy of Arkansas. The Arkansas courts have not addressed this issue. We begin our analysis, therefore, by examining the text of the Arkansas Act. That Act, unlike the Louisiana Act, contains an anti-waiver provision, which provides that a franchisor may not "require a franchisee at the time of entering into a franchise agreement to assent to a . . . waiver . . . which would relieve any person from liability imposed by [the Arkansas Act]." Ark. Code § 4-72-206(1). Although the inclusion of an anti-waiver provision in the Arkansas Act is indicative of the importance the Arkansas legislature attached to the statute, we see nothing in the provision itself to indicate that the legislature intended the Act to embody the state's fundamental policy.

The Seventh Circuit recently addressed a similar situation in *Cromeens*, in which it analyzed the anti-waiver provision of the Maine Franchise Law for Power Equipment, Machinery and Appliances (10 M.R.S.A. § 1361, *et seq.*; the "Maine Law").[28] Like the anti-waiver provision of the Arkansas Act, there was nothing in the anti-waiver provision of the Maine Law to indicate that the legislature intended the statute to embody fundamental policy. As the court observed in *Cromeens*, however, a legislature simplifies the task of determining whether a state statute embodies fundamental policy when it expressly states that the statute constitutes such policy. *Cromeens*, 2003 WL 22519825, at *9. In *Cromeens*, the Seventh Circuit discovered that the Maine legislature had rendered the court's task "exceedingly easy" by including in the Maine Law a section entitled "Public Policy." *Id.* The "Public Policy" section of the Maine Law provides that "[a] contract . . . or activity undertaken pursuant to a contract in violation of this chapter is deemed against public policy and is void and unenforceable." 10 M.R.S.A. § 1368. Relying on this section, the court held that the Maine Law "evidences a strong public policy against contracts that violate the franchise law generally," and that,

---

[28]Pursuant to the anti-waiver provision of the Maine Law, it is unlawful for a manufacturer, without good cause, "[t]o cancel . . . a franchise relationship with a distributor or dealer, notwithstanding . . . the terms or provisions of a waiver . . . ." 10 M.R.S.A. § 1363(3)(B).

because Maine has expressed a strong public policy against allowing choice-of-law provisions to prevail over the statute, franchisees could not waive protection under the Maine Law. *Cromeens*, 2003 WL 22519825, at *10.

In determining whether the Arkansas Act embodies a fundamental policy of Arkansas, we will conduct an analysis like that utilized by the *Cromeens* court. As the Supreme Court of Arkansas has observed, the "public policy [of Arkansas] is declared by the General Assembly." *W. World Ins. Co., Inc. v. Branch*, 965 S.W.2d 760, 762 (Ark. 1998). And the Arkansas legislature, in the Arkansas Act's emergency clause (the "Emergency Clause"), included a provision analogous to the "Public Policy" section of the Maine Law.[29] In the Emergency Clause, the legislature expressly declared that cancellation of franchise agreements in Arkansas, absent good cause, was "vitally affect[ing] the . . . public welfare." 1977 Ark. Acts 355, § 13. More specifically, the Emergency Clause asserted that franchisors, "without good cause and to the great prejudice and harm of the citizens of the State of Arkansas, [were] cancell[ing] existing franchise agreements." And it declared that the legislature had enacted the Arkansas Act to prevent the cancellation of such franchise agreements without good cause, in order to preserve the "public peace, health, and safety" of its citizens. Importantly, the Supreme Court of Arkansas has recognized that the Emergency Clause shows that the legislature "designed the [Arkansas Act] for the protection of the public," and it has acknowledged that the purpose of the Arkansas Act is revealed in its Emergency Clause. *Dr. Pepper Bottling Co. of Paragould v. Frantz*,

---

[29]The requirements for enacting an emergency clause in Arkansas are explained in Amendment 7 to the Arkansas Constitution:

> If it shall be necessary for the preservation of the public peace, health and safety that a measure shall become effective without delay, such necessity shall be stated in one section, and if upon a yea and nay vote two-thirds of all members elected to each house . . . shall vote upon separate roll call in favor of the measure going into immediate operation, such emergency measure shall become effective without delay.

Ark. Const. amend. 7. In interpreting an Arkansas statute, courts may look to the emergency clause to determine legislative intent. *Quinney v. Pittman*, 895 S.W.2d 538, 542 (Ark. 1995).

842 S.W.2d 37, 41 (Ark. 1992). In sum, like the "Public Policy" provision of the Maine Law, the Emergency Clause of the Arkansas Act constitutes a compelling statement of Arkansas policy.

In these circumstances, the anti-waiver provision of the Arkansas Act, considered in conjunction with the declarations made in the Emergency Clause, renders the termination of a dealer agreement, absent good cause, a violation of the fundamental policy of Arkansas. And Arkansas has a materially greater interest than South Carolina in determining whether a dealer agreement between an Arkansas dealer and an out-of-state manufacturer can be terminated without cause. Thus, under the Fundamental Policy test, Clark's Dealer Agreement is governed by the Arkansas Act. We must therefore assess whether Volvo's termination of Clark's Dealer Agreement was permissible under the Arkansas Act.

d.

Volvo maintains that, even if Clark's Dealer Agreement is governed by the Arkansas Act, it did not violate the Act because the Dealer Agreement was terminated for good cause. More specifically, Volvo contends that its legitimate business objective of consolidating its network of motor-grader dealers satisfies the good cause standard of the Arkansas Act. Indeed, in the *Cromeens* controversy, AB Volvo, Volvo Excavators AB, and Volvo Construction Equipment NV (collectively, "AB Volvo") made a similar argument to the Seventh Circuit. And AB Volvo, like Volvo here, maintained that it possessed good cause to terminate its dealers because it had withdrawn from the market the heavy equipment sold by those dealers. *Cromeens*, 2003 WL 22519825, at *10.

In this appeal, Volvo maintains that it possessed good cause to terminate Clark's Dealer Agreement because it withdrew the Champion Motor Graders from the market. Volvo acknowledges that, although the Maine Law assessed in *Cromeens* provided that "[t]here is good cause [for termination of a franchise] when the manufacturer discontinues production or distribution of the franchise goods," 10 M.R.S.A. § 1363(3)(C)(4), the Arkansas Act contains no such provision. Volvo maintains, however, that circumstances other than those enumerated

in the Arkansas Act may constitute good cause, and it contends that a market withdrawal is such a circumstance.

Clark, on the other hand, asserts that, even if the list of what may constitute good cause under the Arkansas Act is not exhaustive, and even if a market withdrawal may constitute good cause for a franchise termination, Volvo did not in fact withdraw the Champion Motor Graders from the market. Clark contends that, because the motor graders currently manufactured by Volvo have not been significantly reengineered, Volvo has not withdrawn Champion Motor Graders from the market. More specifically, Clark maintains that Volvo has simply rebranded the Champion Motor Graders and that it is selling them as Volvo graders. And, according to Clark, such rebranding does not constitute a market withdrawal. Clark contends, therefore, that even if a market withdrawal may constitute good cause under the Arkansas Act, Volvo did not possess good cause for terminating its Dealer Agreement.

In these circumstances, a genuine factual dispute exists as to whether Volvo possessed good cause, under the Arkansas Act, to terminate Clark's Dealer Agreement. We therefore remand Clark's statutory claim (in the Arkansas Litigation) and its statutory counterclaim (in the North Carolina Litigation) for the district court's assessment of whether, pursuant to the Arkansas Act, Volvo terminated Clark's Dealer Agreement without good cause.

IV.

Pursuant to the foregoing, we affirm the district court except as to Clark's statutory claim in the Arkansas Litigation and its statutory counterclaim in the North Carolina Litigation. We vacate the judgment on those two claims only, and we remand for such further proceedings as may be appropriate.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

WIDENER, Circuit Judge, concurring and dissenting:

I concur in part and respectfully dissent in part.

I agree with the result reached by the majority except the treatment of CLM's claim under the Louisiana Act and the claim of Future Equipment Company under the Texas Deceptive Trade Practices and Consumer Act. In my opinion, the decision of the district court as to those claims should be vacated, and as to them should be remanded to the district court for further consideration.

I.

The key provision in CLM's dealer agreement with Volvo is the Local Law Provision, or section 30 of the dealer agreement. The Local Law Provision provides as follows:

> The rights and obligations of the parties hereto shall be subject to all applicable laws, orders, regulations, directions, restrictions and limitations of governments and governmental agencies having jurisdiction over the parties hereto. In the event that any law, order, regulation, direction, restriction or limitation, appropriation . . . or interpretation thereof shall, in the judgment of either party hereto, substantially alter the relationship between the parties under this Agreement or the advantages derived from such relationship, either party may request the other party hereto to modify this Agreement. If, within fifteen (15) days subsequent to making such request, the parties hereto are unable to agree upon a mutually satisfactory modification hereof, then the adversely affected party may terminate this Agreement on fifteen (15) days' notice to the other party.

The Louisiana Act, La. Rev. Stat. Ann. §§ 51:481-82 (West 2003), applies to the CLM-Volvo dealer agreement. In *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192 (5th Cir. 2003), the court explained the prerequisites necessary for the Louisiana Act to apply. For the Louisiana Act to apply in this case, each of the following must be present:

1. A contract or agreement, written or oral;

2.  The contract must be between (1) a dealer,[1] and (2) an agent.[2]

3.  The dealer must be in the business of selling, distributing, or retailing.

4.  The agent must be in the business of wholesaling, manufacturing, or distributing.

5.  The tangible movable (personal) property that the dealer agrees to sell, distribute, or retail and that the agent agrees to wholesale, manufacture, or distribute must pertain to one or more of five industries only: (1) farming; (2) construction; (3) heavy industrial material handling; (4) utility; or (5) lawn and garden.

6.  The tangible movables that are the objects of the dealership contract must be one or more of the following types: (1) equipment; (2) engines; (3) implements; (4) machinery; or (5) attachments.

7.  In addition to the type or types of equipment that are the objects of the dealership contract, the dealer must also agree to sell, distribute or retail, and the agent must also agree to wholesale, manufacture, or distribute repair parts for such equipment.

8.  In the dealership contract, the dealer must agree to maintain an inventory of one or more of the following: (1) repair parts for the subject tangible movables; or (2) the tangible movables themselves; or (3) attachments.

---

[1]A dealer is defined by statute to mean "any farm dealer, heavy industrial equipment dealer, construction equipment dealer, material handling equipment dealer, utility equipment dealer, engines equipment dealer, lawn and garden equipment dealer or retail equipment distributor dealer." La. Rev. Stat. Ann. § 51:481(B)(3) (West 2003).

[2]An agent is defined by statute to mean "any manufacturer, wholesaler or wholesale distributor." La. Rev. Stat. Ann. § 51:481(B)(4) (West 2003).

*Lake Charles Diesel*, 328 F.3d at 200. The CLM-Volvo dealer agreement fulfills all of these prerequisites. Because the dealer agreement fulfills all of the prerequisites outlined by the court in *Lake Charles Diesel*, the substantive sections of Title 51 apply to the dealer agreement. In particular, § 482 is applicable. Section 482(A)(1) provides that:

> [n]o agent, directly through an officer or an employee, may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement or contract without good cause.

La. Rev. Stat. Ann. § 51:482 (West 2003). Accordingly, § 482 is an applicable law under the Local Law Provision of the dealer agreement.

Under the majority's interpretation of the Local Law Provision, § 482 is not applicable in this case because CLM failed to request a modification of its dealer agreement. Maj. Op. at 25-26. But the plain language of the Local Law Provision does not require CLM to request a modification of the dealer agreement in order to gain the protection of § 482. Under the Local Law Provision, either party, *either Volvo or CLM*, could have requested a modification if it believed, "in [its] judgment" that a local law would substantially alter the contractual relationship between the parties. Neither CLM nor Volvo requested a modification. As the majority duly notes in its opinion, Volvo recognized that § 482 would alter the relationship between the two parties:

> According to Volvo, the State Statutes, if applied, would effectively nullify the Without Cause Provision, substantially altering the relationship between Champion and the Dealers.

Maj. Op. at 25-26. Despite this realization, Volvo never sought a modification of the contract.

The Louisiana state legislature added § 482 to Title 51 in 1991. See La. Rev. Stat. Ann. § 51:482 (West 2003). Until the time of this addi-

tion, neither CLM nor Volvo was subject to § 482(A)(i), and immediately upon enactment, and until 2000, either CLM or Volvo could have asked for a modification of the dealer agreement. The reason that CLM did not seek such a modification is at once apparent; under the dealer agreement, if there had been no applicable local law, the agreement could have been terminated under the Without Cause Provision of CLM Dealer Agreement § 24. At the time the dealer agreement was signed in 1984, neither party had any cause to seek a modification. The passage of § 482 in 1991 modified the dealer agreement. CLM had no cause for concern, however, because it derived a benefit from § 482. Volvo, as it admits and as the majority notes in its opinion, did have its rights and advantages altered by the passage of § 482. Maj. Op. at 26. Since Volvo now recognizes the impact of § 482, as shown without objection, it could have recognized § 482's significance at any time since 1991, and did not.

Furthermore, the Local Law Provision provided a method for Volvo to alter the dealer agreement to regain any advantages, in its judgment it lost by the passage of § 482. The majority opinion holds that only CLM bears the burden of requesting a modification of the dealer agreement, but as I have noted, the plain language of the Local Law Provision does not limit to CLM alone the ability to request a modification. The majority interprets the Local Law Provision so that, while § 482 alters the relationship of the parties, CLM loses on its claims because it did not request a modification. Using the same logic, the majority should, with equal facility, reach the opposite conclusion; that because § 482 alters the relationship between the parties, Volvo loses because it did not request a modification.

The majority offers no reason or justification for declaring Volvo the winner with respect to the construction of this provision of the contract, which, by its literal terms, applies to "either party." Indeed, a more logical and reasonable construction of the contract is that in the absence of a "request [of] the other party," the literal terms of the contract should stand as written and unaltered.

Under the majority's reasoning, CLM, as the party benefitting from § 482, must call Volvo's attention to the existence of a provision that benefits CLM for the purpose of altering the relationship to the point

where CLM loses the benefit of § 482. Such a departure from human nature is not a reasonable contract construction, I suggest.

II.

The Local Law Provision, section 30 of the dealer agreement, is reconcilable with the Choice of Law Provision in section 29. For example, prior to 1991, the Louisiana legislature had not enacted § 482. As a result, no local law triggered the application of the Local Law Provision. Had there been a contract dispute prior to 1991, it would have been governed by South Carolina law. After the passage of § 482, the contract is still governed by South Carolina law, except that § 482, as an applicable local law, applies as well.

Yet, under the majority's interpretation of the contract, the Local Law Provision would be surplusage, violating the "universal law of contract law that, in construing language in a contract, 'an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.'" *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 277 (4th Cir. 1987) (quoting *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983); see also *Union Inv. Co. v. Fidelity & Deposit Co. of Ind.*, 549 F.2d 1107, 1110 (6th Cir. 1977)). The majority decision renders meaningless the contractual language in the Local Law Provision that "the rights and obligations of the parties . . . shall be subject to all applicable local laws."

In *Liverpool & London Steamship Protection & Indemnity Association, Ltd. v. Queen of Leman MV*, 296 F.3d 350 (5th Cir. 2002), the court faced a contract construction question similar to the one facing this court regarding the Local Law Provision and Choice of Law Provision in the dealer agreement. Liverpool & London Steamship Protection & Indemnity Association, Ltd., (L & L) provided protection and indemnity insurance to the owners and operators of the QUEEN OF LEMAN. 296 F.3d at 351. The insurance contract between the parties contained four provisions that affected the choice of law that would govern the contract. First, Rule 40 of the contract stated that L & L "is entitled to 'a lien on the ships of a member' for any unpaid premiums." Second, Rule 47 stated that "disputes are to be resolved

either by arbitration or 'by the English High Court of Justice.'" Third, Rule 47C stated that:

> [n]othing herein shall affect or prejudice the right of the Association to take action and/or commence proceedings in any jurisdiction to enforce its right of lien on ships or to otherwise obtain security by seizure, attachment or arrest of assets for any amounts owed to the Association.

Finally, Rule 48 provided that

> [t]hese rules and any special terms of entry form a contract of insurance between the Association and a member, and subject to the right of the Association under Rule 47C to enforce its right of lien in any jurisdiction in accordance with local law in such a jurisdiction, shall be construed in accordance with English law.

See *L & L*, 296 F.3d at 353.

L & L filed a complaint in the Eastern District of Louisiana to seize the QUEEN OF LEMAN for unpaid insurance premiums. 296 F.3d at 351. The district court granted the request, and the vessel was arrested and later sold for $512,000.00. 296 F.3d at 351. The funds from the sale of the vessel were placed in the registry of the district court. Two parties, one who insured the vessel's cargo and one who owned the vessel's cargo, intervened seeking to recover the proceeds from the sale. The intervenors argued that the insurance contract called for the application of English law, under which L & L could not obtain a maritime lien. 296 F.3d at 351. The district judge agreed, granted summary judgment in favor of the intervenors, and L & L appealed to the Fifth Circuit. 296 F.3d at 351-52.

On appeal, the parties agreed "that English law generally governs the contract." 296 F.3d at 352. They also agreed that the procedure for enforcing a lien was governed by the law of the jurisdiction in which the lien was being enforced, in this case the United States. The parties disagreed over whether English law, as the law that governs the contract generally, also determines whether a maritime lien exists.

As the court noted, this disagreement is "significant because even L & L admits it would have no maritime lien under English law." 296 F.3d at 352. In contrast, the federal Maritime Commercial Instruments and Liens Act, 46 U.S.C. §§ 31341-31343, makes a maritime lien available for a party who provides necessaries, which includes marine insurance in the Fifth Circuit, to a vessel. 296 F.3d at 353 (citing *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc)). The intervenors sought to persuade the court that the "reference to local law in Rules 47C and 48 is limited to the procedural aspects of enforcing liens." The argument went that the substantive issue of any lien to which L & L may be entitled is governed by English law, but L & L may enforce the lien by relying on local procedural law. 296 F.3d at 353.

The court disagreed. If the choice of law provision controlled the maritime lien, then the provision in Rule 40 authorizing L & L to secure a maritime lien would have been rendered meaningless because English law did not recognize a maritime lien. 296 F.3d at 353. The court explained that

> [i]f English law controls and there is no maritime lien for unpaid insurance premiums, then L & L would have little need for enforcement provisions, as no right would exist to be enforced. . . . We therefore agree with L & L that in order to give meaning to the entire contract, the determination of whether a maritime lien exists in the first place should be determined by United States law.

296 F.3d at 353-54. The court thus reversed the district court's decision granting the intervenors' motion for summary judgment. 296 F.3d at 355.

The Local Law Provision in the dealer agreement is similar to Rule 47C. By construing the contract to allow the Choice of Law Provision to trump another provision in the contract, the majority follows a path that the *L & L* court rejected because it would not give meaning to the entire contract. See *L & L*, 296 F.3d at 353-54. Because the Local Law Provision can be reconciled with the Choice of Law Provision, this court should allow CLM to pursue its rights under § 482, an applicable local law.

The dealer agreement should be construed to give effect to all of its provisions. See *Osteen v. T.E. Cuttino Constr. Co.*, 434 S.E.2d 281, 284 (S.C. 1993). The majority's interpretation gives no effect to the Local Law Provision. In my opinion, CLM is entitled to the protection of the Louisiana Act, and CLM's claims and counterclaims under the Louisiana Act should be remanded to the district court.

## III.

On remand, the district court should have South Carolina law and the Louisiana Act as the governing law for interpreting the CLM-Volvo dealer agreement. The district court should enforce the Louisiana Act unless there is a rule in North Carolina that prevents the district court from enforcing the Louisiana Act, and no such rule has been brought to our attention. Accordingly, the Louisiana Act should be enforced by the district court on the basis of the Local Law Provision.

The majority concluded that the CLM dealer agreement is to be construed according to South Carolina law. Maj. Op. at 24. The majority reached this decision by applying North Carolina's choice of law rules, which enforce choice of law provisions in contracts. Maj. Op. at 24; see also *Bueltel v. Lumber Mut. Ins. Co.*, 518 S.E.2d 205, 209 (N.C. App. 1999). South Carolina law, while retaining the rule of lex loci contractus,[3] also recognizes the right of parties to choose another jurisdiction's law to govern the contract. *Associated Spring Corp. v. Wilson*, 410 F. Supp. 967, 975 (D.S.C. 1976). The *Associated Spring Corp.* court relied on the following language from the South Carolina Supreme Court's opinion in *Livingston v. Atlantic Coast Line R. Co.*, 180 S.E. 343 (S.C. 1935):

> It is fundamental that unless there be something intrinsic in, or extrinsic of, the contract that another place of enforcement was intended, the lex loci contractu governs. If the contract be silent thereabout, the presumption is that the law

---

[3]The rule of lex loci contractus means "the law of the place where the contract is made governs the contract." *Joye v. Heuer*, 813 F. Supp. 1171, 1173 (D.S.C. 1993) (citing *Livingston v. Atlantic Coast Line R. Co.*, 180 S.E. 343, 345 (S.C. 1935)).

governing the enforcement is the law of the place where the contract is made.

"The act of the parties in entering into a contract at a particular place, in the absence of anything shown to the contrary, sufficiently indicates their intention to contract with reference to the laws of that place; hence the rule as it usually stated is that a contract as to its validity and interpretation is governed by the law of the place where it is made, the lex loci contractu; or more accurately, that contracts are to be governed as to their nature, validity and interpretation by the law of the place where they are made, unless the contracting parties clearly appear to have had some other place in view." 13 C.J., 248.

180 S.E. at 345.

In *Livingston*, the South Carolina Supreme Court explained that South Carolina law allows parties to choose the law that they want to use to enforce their contract. See *Associated Spring Corp.*, 410 F. Supp. at 975 (noting that this view is "widely-held and is generally in conformity with that of the Restatement (Second) of Conflict of Laws § 187 (1971)"). Under the Restatement (Second) of Conflict of Laws § 187(2), South Carolina law will govern the contract unless the

application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

The majority refuses to remand CLM's claims and counterclaims under the Louisiana Act to the district court on the ground that the Louisiana Act does not constitute a fundamental policy of Louisiana. Maj. Op. at 34-35. In my opinion, this reasoning is not only overly- and hyper-technical, it is fundamentally wrong. A statute enacted by a state legislature establishes the public policy of that State. See *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524 (1959) ("Policy decisions are for the state legislature, absent federal entry into the field.");

*Barnes Group, Inc. v. C & C Prods., Inc.*, 716 F.2d 1023, 1031 (4th Cir. 1983) ("[I]t seems apparent that where the law chosen by the parties would make enforceable a contract flatly unenforceable in the state whose law would otherwise apply, to honor the choice-of-law provision would trench upon that state's 'fundamental policy.'").

Every state court in the Fourth Circuit has also recognized the state legislature as the definitive voice on pronouncements of public policy. See *Schmeizi v. Schmeizl*, 46 A.2d 219, 621 (Md. 1946) ("The court cannot adopt a public policy contrary to the plain provisions of the statute."); *Pitt & Greene Electric Membership Corp. v. Carolina Power & Light Co.*, 120 S.E.2d 749, 754 (N.C. 1961) ("[P]ublic policy is for legislative determination."); *Brown v. Drake*, 270 S.E.2d 130, 132 (S.C. 1980) ("Public policy is basically for the legislature"); *Wood v. Board of Supervisors of Halifax City*, 236 Va. 104, 115 (1988) ("[I]t is the responsibility of the legislature, not the judiciary, to formulate public policy."); *State v. Varney*, 96 S.E.2d 72, 76 (W. Va. 1956) (". . . the public policy of a state is a law of the state, and is a legislative and not a judicial function, and it is not the function of the judiciary to declare what is the public policy of the state respecting matters on which the legislature has spoken . . .").

The Supreme Court of Louisiana especially has expressed its opinion as to whether statutes express the public policy of Louisiana in a case involving a state antitrust law. *State v. American Sugar Refining Co.*, 71 So. 137, 142-143 (La. 1916).

> . . . the public policy of a state is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts. But, when the Legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statutes passed by it enacts public policy to be. The only authentic and admissible evidence of public policy of a state on any given subject are its Constitutions, laws, and judicial decisions. The public policy of a state, of which courts take notice and which they give effect, must be decided from those sources. Where the state has spoken through its legislators, there is no room for speculation as to what the policy of the state is.

So, in my opinion, it is beyond argument that the fundamental policy of Louisiana is expressed in § 51:482.

Section 51:482, barring cancellation of the contract without cause, was enacted by the Louisiana state legislature. In this circuit, nothing else appearing, we must accept that statute as the fundamental public policy of Louisiana. See *Hall v. McKenzie*, 537 F.2d 1232, 1234 (4th Cir. 1976)("[T]he determination of legislative policy for the State of West Virginia is for that state and not us."); *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778 (4th Cir. 1995) ("[W]e will not attempt to decide the public policy of the State of Virginia absent a clear and dominant articulation of that policy by the Commonwealth herself."). By concluding that the Louisiana Act does not constitute a fundamental policy of Louisiana, the majority is making its own determination that the Louisiana Act, as a statute, does not express the fundamental public policy of Louisiana. Our court cannot determine the public policy of Louisiana, even if the Fifth Circuit is willing to do so. See *St. Paul Fire & Marine*, 48 F.3d at 783. C.f. *Cherokee Pump & Equipment, Inc. v. Aurora Pump*, 38 F.3d 246, 252-53 (5th Cir. 1994). Instead, the Louisiana state statute must be viewed as the fundamental public policy of that State.

Whatever the Fifth Circuit may have decided, *Cherokee Pump* is a flawed authority on which to rest our decision. *Cherokee Pump* recites, 38 F.3d at 253, that "There is no case law evidencing that the Repurchase Statute amendment espouses public policy in Louisiana." Along the same line, the majority in this case recites that "The Louisiana courts have not addressed this issue," referring to whether the Louisiana statute is a fundamental policy of Louisiana. Although *State v. American Sugar Refining Co.*, 71 So. 137 (La. 1916) has been in full force and virtue in that State for some 88 years and has not been modified or overruled, both the Fifth Circuit and the majority here persist in their reasoning that the subject has not been addressed by the Louisiana courts. To repeat, *American Sugar* stated:

> But, when the Legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statutes passed by it enacts public policy to be.

71 So. at 142. That certainly should end the discussion, but just as *Cherokee Pump* did not mention *American Sugar*, so the majority

here does not. Such omission, both by the Fifth Circuit and this court, is flawed reasoning, I suggest.

If that were not enough, and of even more importance, the case of *Barnes Group, Inc. v. C & C Prods., Inc.*, 716 F.2d 1023 (4th Cir. 1983), is on facts which are indistinguishable from those at hand, and, on the same question, determines that where the law chosen by the parties would make enforceable a contract flatly unenforceable in the State whose law would otherwise apply, "the choice of law provision would trench upon that State's 'fundamental policy.'" 716 F.2d at 1031. *Barnes Group* was a case in which Barnes, the plaintiff, alleged that C & C, the defendant, had interfered with Barnes' contracts with six of Barnes' sales agents. Barnes was an Ohio company, and its contracts with its agents provided that they should be construed in accordance with the laws of the State of Ohio. Three of the salesmen, however, were from Alabama, and their territories were exclusively in Alabama. The contract of employment, which included a covenant not to compete, was void as against public policy under Alabama law and could not be enforced. The holding of this court was:

> To honor the contractual choice of law would make enforceable a contract flatly unenforceable in Alabama, surely impinging upon "fundamental policy" of Alabama. It was error, therefore, for the district court to apply Ohio law to determine the enforceability of the Alabama salesmen's covenants not to compete.

716 F.2d at 1032. Applying the facts of this case to the holdings of *Barnes Group*, the law chosen by the parties, South Carolina, would permit a contractual provision for cancellation to be without notice, and would make enforceable in Louisiana a contract "flatly unenforceable" in Louisiana under § 51:482, the law of that State. The holding of *Barnes Group* is that such a choice-of-law provision would "trench upon [Louisiana's] 'fundamental policy.'" 716 F.2d at 1031. And the impinging of the fundamental policy of Louisiana, error here as there, means that the statute of Louisiana, § 51:482, must be applied. Louisiana is the State in which the dealership is located, and which even the majority in this case agrees had a greater interest than the chosen State of South Carolina.

Applying the rule of § 187(b) Restatement (Second) Conflict of Laws to this case indicates that the Louisiana Act should apply, for if the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue" the law of South Carolina should not apply. I have just demonstrated that the fundamental policy of Louisiana is expressed in the statute requiring that such contracts not be cancelled by the manufacturer without cause. It is also beyond doubt that Louisiana has a materially greater interest than South Carolina in determining whether a dealer agreement between a Louisiana dealer and an out-of-state manufacturer can be terminated without cause. The majority holds just that with relation to the Arkansas dealer,[4] and no reason is apparent why the Louisiana dealer should be treated differently on what are essentially the same facts. The only difference in the two statutes is that Arkansas has some kind of anti-waiver provision mentioned by the majority, but even Arkansas does not have an opinion of its Supreme Court taking nearly so strong a stand as the position of the Louisiana court in *American Sugar* that statutes reflect the fundamental policy of Louisiana. In my opinion, the clearly implicit holding of the majority, that a statute without an anti-waiver provision is not the fundamental policy of a State, is clearly wrong.

## IV.

I am further of opinion that the claim of Future Equipment Company, Inc. under the Texas Deceptive Trade Practices and Consumer Protection Act, Vernon's Texas Statutes and Codes Ann., Title II, § 17.41, et seq., should be re-examined on the merits.

This case is a result of a "judgment on the pleadings," A.486, and not based on depositions, affidavits, etc., a factual development, as is the more usual case.

---

[4]"And Arkansas has a materially greater interest than South Carolina in determining whether a dealer agreement between an Arkansas dealer and an out of state manufacturer can be terminated without cause." Maj. Op. at 39.

> For the purposes of the court's consideration of the motion [for judgment on the pleadings], all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true, and all contravening assertions in the movant's pleadings are taken to be false.

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* 520 (2d. ed. 1990) relying on *National Metropolitan Bank of U.S.*, 323 U.S. 454, 457 (1945) and various cases from the federal courts of appeals and district courts. In Count III of the Arkansas complaint found in this appendix at A.298, the following allegation is made by Future Equipment Company:

> 53.    At all times material to this action, FEC was a 'business consumer' as that term is defined in the Texas Deceptive Trade Practices and Consumer Protection Act ('DTPA'), Tex. Bus. & Com. Code, § 17.41, et seq., in that FEC is a corporation or business that sought and/or acquired goods or services by purchase or lease, and the goods or services formed the basis of their claims.

Section 17.45 (10) provides that:

> 'Business Consumer' means an individual, partnership or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use. The term does not include this state or a subdivision or agency of this state.

So, for the purposes of judgment on the pleadings under Rule 12, as here, we must consider that FEC is a "business consumer, a corporation who seeks or acquires by purchase or lease . . . goods or services for commercial or business use." That is sufficient to qualify Future Equipment to have its claim examined under the Texas Deceptive Trade Practices and Consumer Protection Act under Texas law as found in *Fisher Controls Intern., Inc. v. Givens*, 911 S.W. 2d. 135 (Tx. App. 1995) and *Texas Cookie Co. v. Hendricks & Peralta*, 747 S.W. 2d. 873 (Tx. App. 1988). Briefly, *Texas Cookie* held that the fact that the transfer agreement "involved the transfer of 'goods or services' for purpose of the DTPA," *Texas Cookie*, 747 S.W. at 877,

qualified Hendricks for relief under the Texas Deceptive Trade Practices and Consumer Act, the same statute involved here.

This is not to say that a future factual development may not add to the facts favorable to Future Equipment or to the facts favorable to Volvo. But it is clear that judgment in favor of Volvo should not have been entered *on the pleadings which admit the necessary facts*, and that the case on remand should require examination and development of that aspect or Future Equipment's claim.

In all events, if the majority holding is correct, that Future Equipment loses because "FEC does not allege that it paid for an intangible right to continue to be a champion dealer and no payment is reflected in the dealer agreement," there would have been no dealership contract to cancel, and this case is nothing more than an exercise for the lawyers.